No. 43.—PRESSLEY (a slave) plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] It is too late to object to a correction of the lists of Jurors, directed by the Court in the progress of selecting the Jury, if the objection be made after trial and verdict. If the prisoner were deprived of any right by the proceeding, the objection should, on this account, have been made to the Court, when a correction could have been applied and the ends of justice subserved.

[2.] The Court may illustrate his instruction to the Jury, by a hypothesis which is unfavorable to the prisoner, if there be facts in the case to authorize such hypothesis ; and is not under obligation to say anything of an opposite state of facts, if there be no evidence to this effect before the Jury.

[3.] It is not error in the Court to decline to charge that the prisoner is not liable, if the death was produced by bad surgery, if there were no evidence of bad surgery in the case.

Murder, in Oglethorpe Superior Court. Tried before Judge THOMAS W. THOMAS, October Term, 1855.

Pressley (a slave) *vs*. The State.

A motion was made for a new trial in this case, on the following grounds:

1st. The first panel of Jurors being presented to the prisoner's Counsel, they were asked if they had any objection to the panel? And they replied none. The *fifth* Juror called was William H. *Olive*. Prisoner objected, because no such man appeared on his list, it being there written William H. *Ogilvie*. *Olive* was one of the original panel of 24 in attendance on the Court. The whole panel were not called before being put on the prisoner. The Court corrected the prisoner's list, and ordered *Olive* to be put upon the prisoner, and prisoner challenged him. This was the first ground for a new trial.

2d. Because the Court erred in charging the Jury upon implied malice, after reading to them the section of the Penal Code, in adding " To illustrate by this case: If you believe, from the evidence, that prisoner killed Boston (the dec'd) because Boston called him a d——d white-eyed son of a b——h, this is no considerable provocation, and the circumstances of the killing show an abandoned and malignant heart. The law implies malice, and the killing is murder."

3d. Because the Court erred, upon being requested by Counsel for prisoner to charge the Jury, that the defendant was not guilty of the homicide, if the death was not the natural result of the wound, if left to itself, but was the consequence of improper treatment, in saying to the Jury, that "such is the law, but the *onus* of proving the unskilful surgery, was upon the defendant, and the Court charges you that there is no evidence of bad surgery in this case."

4th. Because the bill of indictment was not read or submitted to the Jury, until they returned into Court and rendered their verdict. The Solicitor General, at the opening of the case, stated to the Jury the nature of the charge, and the proof he expected to make.

The Court below refused to grant a new trial, and this decision is assigned as error.

T. R. R. Cobb, for plaintiff in error.

A. H. Stephens & L. Stephens, for defendant.

*By the Court.*—Starnes, J. delivering the opinion.

[1.] It does not appear, that any injury resulted to the prisoner from the proceeding, as it related to the Juror, Olive.

It is true, that the name of Ogilvie, appeared on the list of Jurors handed to the prisoner's Counsel, instead of that of Olive, (which was the right name, and not the name on the Clerk's list,) until the name of Olive was called in the progress of forming a Jury, when the variance was detected, and the list corrected by order of the Court. But if the prisoner had been deprived of any right by this proceeding, his Counsel should have made it known at the time, and then the Court might have given to the matter such a direction as would have protected the prisoner's rights, and still have subserved the ends of justice. No objection, however, on this ground was made. And it is too late now, after trial and verdict, to insist that the prisoner might have been deprived of his rights by this irregularity.

[2.] It is objected, that the charge was not accurate and fair, because the Court illustrated by the case, but put the illustation on a hypothesis which contemplated the prisoner as guilty of the crime of murder, and said nothing of a state of facts which might show that he was guilty of a less offence, or of no offence whatever. And to sustain this exception, it is argued that the decedent did not receive the mortal blow when he and the prisoner were together on the floor, and when nothing had occurred more than abusive language, to provoke a mortal blow from the prisoner, but that this blow was in all probability given when the decedent was rushing out after the prisoner, who was leaving the room, and who, alarmed and agitated by the pursuit of the decedent, struck

back at the latter with his knife, and inflicted the wound which resulted in death.

If there had been evidence before the Jury to authorize this view of the case, it would have been unfair in the Court to have presented the hypothesis as he did, without bringing this view of the matter also to the attention of the Jury. But upon careful examination, we can find no testimony which justifies this conclusion. And therefore, we cannot say that the Court should have presented such a hypothesis to the Jury.

[3.] It was also insisted, that the Court erred in telling the Jury, that "there was no evidence of bad surgery" in the case. That the Counsel, in the use of the term "bad surgery," had not meant to speak of surgical treatment proper, but of unskilful and injudicious treatment; and that of this there was evidence.

Let the definition of the Counsel be received; and still, in our opinion, there was no evidence of such unskilful and improper treatment as should relieve this prisoner from responsibility, as the perpetrator of the decedent's death, and authorize the Court to say anything about bad surgery.

The removal of the latter to his master's house, seems not to have been such injudicious treatment as produced his death, because this removal occurred soon after the wound was inflicted, the decedent lived some five days afterwards, and the physician testifies that the secondary hemorrhage, which was the immediate cause of the death, was a recent thing. No other evidence, which might be supposed to show injudicious treatment, was presented. The Court was therefore right in the observation made.

But even if this removal of the decedent, or any such act not plainly shown to have been unreasonable and wrong, had been the immediate cause of the death; still, would the prisoner be responsible for the act, unless, indeed, it were plainly shown that the wound was not, in its nature, mortal. And even unreasonable and injudicious treatment, which might be supposed to have been the immediate cause of the death, should not relieve the perpetrator of such an offence, unless

it were clearly shown that the wound was not necessarily mortal.

The testimony of the physician in this case is, that the wound was in the heart, and that not one in a hundred ever recover from wounds in the heart. He says, it is true, that secondary hemorrhage was the immediate cause of the death in this instance; that it was possible that secondary hemorrhage might have been avoided, if the patient had been kept quiet, and that from his having lived as long as he did, it would seem that upon a calculation of the doctrine of chances, the patient might have lived if he had been kept quiet.

From this it is argued, that death would not have resulted but for injudicious treatment.

This argument is not supported by the facts. There is nothing to show such injudicious treatment. As we have shown, the removal of the decedent to his master's house could not be so regarded. And it is not affirmatively shown, as we say it should be shown, in order to exonerate the prisoner from responsibility for such an act, that the wound was not mortal, but the death resulted from improper treatment. On the contrary, it was said by the physician, that it was barely possible, upon a calculation of chances, that death might not necessarily have resulted from the wound. And this physician states elsewhere, that he saw no other cause for the death but the wound. Again, he says that he had no doubt that the decedent died of the wounds inflicted.

Under these circumstances, we think it was not error in the Court to say that there was no evidence of bad surgery (even in the sense of bad treatment) in the case.